KINSELLA WEITZMAN ISER KUMP LLP
ALAN KOSSOFF (SBN 150932)
  akossoff@kwikalaw.com
NICHOLAS C. SOLTMAN (SBN 277418)
  nsoltman@kwikalaw.com
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Telephone: 310.566.9800
Facsimile: 310.566.9850

Attorneys for Plaintiff G&H
DIVERSIFIED MANUFACTURING, LP

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| G&H DIVERSIFIED MANUFACTURING LP, a Texas limited partnership<br><br>Plaintiff,<br><br>vs.<br><br>REGREEN TECHNOLOGIES, INC. f/k/a Regreen International Solutions Inc., a California corporation; ALBERT AVEDIS MARDIKIAN, an individual; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 8:21-cv-62<br><br>**COMPLAINT FOR:**<br><br>**(1) BREACH OF CONTRACT**<br><br>**(2) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>**(3) COMMON COUNTS;**<br><br>**DEMAND FOR JURY TRIAL** |

KINSELLA WEITZMAN ISER KUMP LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

**INTRODUCTION**

1)    It is often said that no good deed goes unpunished. In the case of Plaintiff G&H Diversified Manufacturing, LP ("G&H"), that good deed was its trust in, and patience with, Defendant Regreen Technologies, Inc. ("Regreen"). This case arises out of Regreen's repeated broken promises to pay G&H for work that Regreen requested—or, sometimes, pleaded with G&H to do—in breach of several contracts between the parties.

2)    G&H was founded in 1958 as a small tool and die shop. In 1983, it was acquired by Janan and Ed Kash. Almost 40 years later, it remains a family-owned business, run by their two sons, Jimmy and Danny, in Houston. They have overseen G&H's growth into a premier metal manufacturer of advanced products for companies in the oil & gas, architecture, technology, transportation, defense, and many other industries.

3)    Regreen is a "green technology" firm founded by Defendant Albert Mardikian. Its main product is its so-called "total waste system," which uses specialized technology to turn solid municipal waste into end products (pellets, fluff, or powder), which are odorless, nearly free of harmful viruses and bacteria, and low in emissions. The end product can be used as fertilized and/or animal feed (if organic), or a source of clean-burning fuel (if not).

4)    As of late 2017, Regreen's machines had always been built in Turkey. Increasingly, however, many of its (potential) customers were unwilling to purchase machines manufactured abroad. A consultant hired by Regreen identified G&H as an American manufacturer that could build its high precision and fully-certified machines. After several trips from Houston to Los Angeles (and vice versa) for the parties to conduct preliminary diligence, Danny and Jimmy Kash flew to Los Angeles to discuss the specifics of building a 15-ton unit. During those negotiations, Mardikian explained that it would be too suspicious to request the drawings from

KINSELLA WEITZMAN ISER KUMP LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   Regreen's Turkish manufacturer; instead, they would import the Turkish machine
2   and G&H would reverse engineer it.

3       5)    Eventually, the parties agreed that as part of an exclusive
4   manufacturing relationship for the United States, G&H would purchase the Turkish
5   machine for $1.6 million, reverse engineer it, and construct a master 3D drawing;
6   when that was done, Regreen would repay the $1.6 million, plus G&H's costs and a
7   small profit margin; and Mardikian would execute a personal guaranty to secure the
8   amount paid for the machine and the reverse engineering work to be done. This
9   global agreement took the form of several contracts.

10      6)    First, the parties entered into the May 15, 2018 Manufacturing
11  Agreement (the "Manufacturing Agreement"), a true and correct copy of which is
12  attached hereto as **Exhibit A**. Relevant here, G&H agreed to purchase one 15-ton
13  Regreen System for $1.6 million (Ex. A ¶¶ 1, 8), to "dismantle the Machine, inspect
14  and make measurements, and prepare a master 3-D model of the Machine" (*id.* ¶ 5),
15  and then to "rebuild the Machine and stage it for pick-up by Regreen" (*ibid.*).
16  Regreen, in turn, agreed to pay G&H (i) $1.6 million, (ii) "all costs G&H incurs in
17  the process of disassembly[] and reassembly of the Machine and creating the master
18  3-D model," and (iii) "a profit margin of fifteen percent (15%) on the total costs
19  incurred including the cost of the machine" (collectively, the "Phase 1 Payment").
20  (*Id.* ¶ 9.) "Upon the completion of Phase 1," Regreen also granted G&H "the right,
21  but not the obligation, to manufacture on an exclusive basis the first five (5)
22  Redesigned Machines … to be ordered by Regreen," which would be reflected in
23  "purchase orders to G&H … as needed." (*Id.* ¶ 11.) The parties called these
24  Machines 1-5, and they were to be manufactured from the new drawings and
25  improved designs created by G&H after reverse engineering Machine 0. Although
26  the Manufacturing Agreement contains a force majeure clause, that clause does not
27  address epidemics or pandemics, only "acts of God, acts of war, riot, fire, explosion,
28  flood or sabotage." (*Id.* ¶ 20.)

7)    <u>Second</u>, "to secure Regreen's payment of the Phase 1 Payment," Mardikian "personally guaranteed payment of the Phase 1 payment." (Ex. A ¶ 9.) Mardikian's May 14, 2018 Personal Guaranty, a true and correct copy of which is attached hereto as **Exhibit B**,[1] obligates him personally in case Regreen "fail[ed] to … pay, when due, all sums due G&H according to the terms and conditions of the Manufacturing Agreement." (Ex. B ¶ 1.) It also provides that it is not "necessary for G&H, in order to enforce the Guarantor's obligations under this Guaranty, to first institute a lawsuit or other proceeding against Regreen or exhaust any or all of G&H's remedies against Regreen." (*Id.* ¶ 4.)

8)    <u>Third</u>, the Phase 1 Payment was reflected in, and secured by, a note from Regreen to G&H, which was "attached to [the Manufacturing] Agreement." (Ex. A ¶ 10.) The Convertible Note, a true and correct copy of which is attached hereto as **Exhibit C**,[2] recited a principal amount of $1.6 million (Ex. C p. 1), and also provides for "interest from the date of" the Note (i.e., May 15, 2018) "on the unpaid principal balance at a rate equal to 6% per annum, computed on the basis of the actual number of days elapsed and a year of 365 days." (*Ibid.*) As of the Maturity Date of December 10, 2019 (Ex. C ¶ 5)—which was the earliest date the "unpaid principal, together with any then unpaid and accrued interest and other amounts payable thereunder" were due (Ex. C p. 1)—Regreen had accrued interest of $150,180. Since that date, interest has continued to accrue on the unpaid principal. Not surprisingly, given the nature of the instrument, the Note lacks a force majeure clause.

---

[1] The Personal Guaranty was also attached as Exhibit A of the Manufacturing Agreement.

[2] The Convertible Note was also attached as Exhibit B of the Manufacturing Agreement.

KINSELLA WEITZMAN ISER KUMP LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

9)    The net effect of these interlocking agreements was that G&H was doubly protected. Not only was the Phase 1 Payment personally guaranteed by Mardikian, but G&H became (by virtue of the Note) debt holders, thereby placing it in a higher priority position in the event of a bankruptcy or receivership. For its part, Regreen was, or should have been, indifferent to the existence of the Note, because if it fulfilled its payment obligations under the Manufacturing Agreement, then the Note would become null and void.

10)    As discussed in more detail below, G&H held up its end of the bargain. It paid the first installment of the $1.6 million purchase price ($500,000 (Ex. A ¶ 8)) on April 17, 2018, and the remainder on June 27, 2018. The containers with the submachines for the Turkish machine, which the parties referred to as "Machine 0," arrived in multiple shipments in June 2018. G&H then set about reverse engineering Machine 0. Ultimately, it completed this process—as Regreen acknowledged, numerous times. But Regreen either did not have, or would not devote, the money to pay G&H. Indeed, it induced G&H to forestall this Action by embarking on Phase 2, entering into a separate agreement to order Machines 1, 2, and 3—evidently, in the hopes of using the proceeds from their "presales" to pay off its debt on Machine 0. But the "presales" either did not exist or did not pan out, and Regreen was always delinquent on its obligations, using post-dated checks, and pleading poverty months before any business could plausibly claim to have been affected by COVID-19. After over a year of stalling and excuses, Regreen and Mardikian have left G&H with no choice but to institute this Action.

## JURISDICTION AND VENUE

11)    This Court has diversity jurisdiction over the present action under 28 U.S.C. § 1332(a)(1) because there is complete diversity between the plaintiff and the defendants.

12)    Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1391(d) because all defendants reside in this District and are therefore residents of

Kinsella Weitzman Iser Kump LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

California; because a substantial part of the events or omissions giving rise to the claim occurred therein; and because it is where the contracts at issue were entered into, where they were to be performed, and where their breaches occurred.[3] In addition, two of the contracts at issue contain forum selection clauses specifying a court of competent jurisdiction in Orange County, California. (E.g., Guaranty ¶ 9; Manufacturing Agreement ¶ 24.)[4]

## THE PARTIES

13)    Plaintiff G&H Diversified Manufacturing ("G&H" or "Plaintiff") is a limited partnership, incorporated and with its principal place of business in Houston, Texas. G&H's general partner is a Texas resident, and its limited partners are another Texas resident and a limited liability corporation (LLC). The LLC's two members are also residents of Texas.[5]

---

[3] *See generally Ins. Co. of N. Am. v. Matson Terminals, Inc.*, 2014 WL 10987407, at *3 (C.D. Cal. Apr. 10, 2014) ("In a contract action such as this one courts have looked to such factors as where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred.") (internal quotation omitted) (citing, e.g., *Shropshire v. Fred Rappoport Co.*, 294 F. Supp. 2d 1085, 1094 (N.D. Cal. 2003)).

[4] By contrast, the Convertible Note provides for jurisdiction and venue in "the state courts in Santa Clara County in the State of California (or in the event of exclusive federal jurisdiction, the courts of the Northern District of California) …." (Ex. C ¶ 6(i).) "However, a court may refuse to enforce a forum-selection clause if there are conflicting forum-selection clauses at issue." *Primary Color Sys. Corp. v. Agfa Corp.*, 2017 WL 8220729, at *6 (C.D. Cal. July 13, 2017) (declining to "enforce[] both forum-selection clauses," which would have required plaintiff to "litigate one of its claims in Belgium and three of its claims in New Jersey"); *see, e.g.*, *B & O Mfg., Inc. v. Home Depot U.S.A., Inc.*, 2007 WL 3232276, at *3 (N.D. Cal. Nov. 1, 2007) (finding that enforcing two forum-selection clauses requiring the parties to litigate claims in two different forums would be "unreasonable under the circumstances" because the claims would need to be divided and litigated).

[5] *See Johnson v. Columbia Props. Anchorage LP*, 437 F.3d 894, 899 (9th Cir. 2006) ("Columbia is a limited partnership in which the two partners are limited

KINSELLA WEITZMAN ISER KUMP LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

14)    Defendant Regreen Technologies Inc. ("Regreen") is a California corporation, with its principal place of business located in Orange County, California. It was previously known as Regreen International Solutions, Inc.

15)    Defendant Albert Mardikian, the Chief Executive Officer of Regreen, is a California resident whose domicile is in Orange County, California. He executed a personal guaranty of certain of Regreen's debts at issue in this case.

16)    Plaintiff is currently unaware of the true names and capacities of defendants Does 1 through 10, inclusive, and therefore sues those defendants by fictitious names. Plaintiffs will seek to amend this complaint to allege the true names and capacities of Does 1 through 10, inclusive, when and if they are discovered. Plaintiff is informed and believes, and on that basis alleges, that Does 1 through 10, inclusive, and each of them, participated in the wrongful acts alleged herein, and are liable for those acts. Plaintiff is informed and believes, and on that basis alleges, that Does 1 through 10, inclusive, knew and participated in one or more of the specific acts committed by Regreen and Mardikian, and counseled Regreen, Mardikian, and the other Doe defendants in perpetrating those wrongful acts, and/or aided and counseled Regreen, Mardikian, and the other Doe defendants in concealing those acts from Plaintiff, as alleged more fully herein.

17)    Plaintiff is informed and believes, and on that basis alleges, that in doing the acts alleged herein, Regreen was the alter ego of Mardikian, and acted with Mardikian's knowledge, consent, and approval. As such, Mardikian is responsible for the liabilities of Regreen (not just under the Personal Guaranty), as alleged herein.

---

liability companies, or LLCs. Because a partnership is a citizen of all of the states of which its partners are citizens … diversity jurisdiction turns on the citizenship of the two LLCs. … [L]ike a partnership, an LLC is a citizen of every state of which its owners/members are citizens.").

# GENERAL ALLEGATIONS

## A.    G&H Embarks on Phase 1

18)    Following execution of the agreements at issue in this Action, G&H hired 10 contract employees in connection with the reverse engineering (i.e., Phase 1), including a project manager, technicians, millwrights and 3D designers. G&H also procured an office trailer, computers, design software, cameras and measuring equipment to support the initial tasks of Phase 1. By September 1, 2018, costs and the 15% profit margin thereon amounted to a total of $667,252. (Ex. A ¶ 9(ii), (iii).) On October 12, 2018, G&H submitted the completed drawing book for Machine 0 to Regreen. The following day, G&H billed a final $101,000 of costs and profit, for a total of over $768,000.

19)    As discussed in more detail below, based on Regreen's demands related to Machines 1-5, G&H did not focus on finishing Machine 0, testing it, and determining where it would be shipped. As a result, G&H did not prepare Machine 0 for delivery until December 15, 2019 (i.e., the day it was rebuilt and updated to conform to Regreen's final specifications). As it turned out, this delay was immaterial, because as of the date of this filing, Regreen has *still* never located a buyer willing and able to accept delivery of Machine 0.

20)    Although the Phase 1 Payment was technically not due until 30 "days of the Rebuilt Machine [i.e., Machine 0] being delivered to Regreen's customer" (Ex. A ¶ 9), and Machine 0 remains at G&H's Houston facility, Regreen paid the $768,000 in Phase 1 costs and profits between September 2018 and August 2019. Specifically, Regreen made payments of $267,252 in September 2018, $200,000 in November 2018, $200,000 in December 2018, and $100,943 in August 2019. By the same token, although G&H did not, strictly speaking, have the "right" to manufacture Machines 1-5 until "completion of Phase 1" (Ex. A ¶ 11), Regreen ordered all five machines in September 2018. By its conduct, Regreen has therefore acknowledged that G&H has done everything in its power to secure "delivery" of

KINSELLA WEITZMAN ISER KUMP LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

Machine 0, and any holdup is attributable to Regreen. But despite making the required payments under Paragraphs 9(ii) and (iii) of the Manufacturing Agreement, Regreen has never reimbursed G&H for the $1.6 million spent on Machine 0 itself, as set forth in the very same paragraph requiring payment of the $768,000 in costs and profits. (Ex. A ¶ 9(i).)

### B.    The Parties Enter into the Letter Agreement

21)    While Phase 1 was underway, G&H was simultaneously sourcing components and getting quotes from subcontractors to prepare a quote for Machines 1-5. During these negotiations, Regreen, and in particular Mardikian, emphasized that it had "presold" the machines, and was having no issues finding investors. Consistent with that claim, the resulting September 13, 2018 Letter Agreement ("the Letter Agreement"), a true and correct copy of which is attached hereto as **Exhibit D**, forecasted a whopping *17* machines to be delivered in 2019. (Ex. D p. 1.) Regreen also pressed G&H to have Machine 1 completed and ready to deliver by the end of the year—less than three months later. (*Ibid.*) Indeed, Regreen's preferred delivery schedules for Machines 1-5 essentially called for G&H to deliver one machine per month (*ibid.*), thereby requiring G&H to contract with its outside supplies for materials and components for all five machines at once.

22)    Under the Letter Agreement, Machines 1-5 were to cost $1.73 million each, which Regreen agreed "to pay 50% down [ ] as soon as Regreen Systems are purchased (with Purchase Orders, 'P.O's') and released to production," with an additional "40% down when ready to test (RTT)." (*Ibid.*) "RTT" is a term of art in the engineering industry, which refers to the status of a machine that is ready to be (but has not yet *been*) tested. Indeed, the custom and practice in the industry is that testing costs are *never* included in the purchase price, because it is impossible to predict the testing scope and, therefore, what testing will cost. Finally, the Letter Agreement provided that "[a]ll rigging/transportation efforts to clients or off-site locations" (i.e., locations other than G&H's "own property") were "to be pre-paid

1    and add (ex-works G&H-Houston) or handled by Regreen." (*Ibid.*) "Pre-paid and

2    add" is another term of art in the engineering industry, which means that the

3    shipper—in this case, G&H—handles the shipping cost and then adds it to the

4    invoice once shipped. In other words, under the Letter Agreement, Regreen was

5    always responsible for all shipping costs, *in addition* to the $1.73 million purchase

6    price.

7    **C.    Regreen Pushes G&H To Commence Phase 2**

8    23)    But while the POs were generated concurrently with the Letter

9    Agreement, and Regreen directed G&H to begin work on the first three machines

10    right away, Regreen had not made any of the corresponding down payments by

11    October 24, 2018. By this time, it was too late for G&H to cancel all of the

12    outstanding orders to third-party suppliers, so G&H was left with about $215,000 in

13    out-of-pocket expenses—a testament to its diligence in mitigating its exposure.

14    Together with the purchase price for Machine 0 and the costs of reverse engineering

15    it, G&H had incurred about $3 million in expenses since May, but been paid only

16    $267,252 to date. It therefore threatened to shut down production if Regreen did not

17    make the promised down payments.

18    24)    To appease G&H, the next week Regreen paid an additional $200,000

19    toward the Machine 1 down payment, and promised to pay another $500,000 before

20    the end of 2018. This was not enough to convince G&H to keep spending money,

21    however, and it halted all production. In December 2018, Regreen paid another

22    $200,000 (also considered a down payment on Machine 1) to help G&H pay off *its*

23    suppliers and, more importantly, keep G&H on board. Still, the project languished

24    through December and into January 2019.

25    **D.    G&H Designs and Manufactures the Delta Modifications at**

26    **Regreen's Request**

27    25)    In late January 2019, Regreen handed G&H a post-dated check for

28    $465,000, and agreed to make $500,000 in payments over the next 60 days. Regreen

KINSELLA WEITZMAN ISER KUMP LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

also informed G&H that it was nearly done securing a home for Machine 0 in Maryland. In the next breath, it first broached the so-called "Delta modifications" to Machine 1. In simple terms, these modifications entailed the construction of a large structural platform (so large, in fact, that it had to be assembled in the parking lot) that allows some of the equipment to be stacked vertically, thereby drastically reducing the overall footprint of the Machine. This would have allowed Regreen to sell units to customers with far less space available than what the current system required. Regreen initially asked G&H to include the Delta modifications in the $1.73 million price, which G&H refused to do. Ultimately, the parties came to an oral agreement on or about January 30, 2019 during an in-person meeting at Regreen's former offices in Santa Ana (the "January 2019 oral agreement"). Under the January 2019 oral agreement, the parties agreed to design the Delta system jointly, with G&H passing through any expenses associated with the modifications "at cost," and Regreen paying such expenses as they came due.

26)    While Machine 0's imminent disposition turned out to be false, Regreen did finalize the 50% down payment on Machine 1, which was enough to induce G&H to continue work on it. In May 2019, after Regreen approved G&H's work orders related to the Delta modifications, G&H turned to implementing them.

27)    G&H spent May and June 2019 preparing for the testing of Machine 1 and tweaking the designs of many components to make everything fit. The "Delta Add-Ons" to Machine 1 ultimately cost $112,500—none of which Regreen has repaid. Upon approval of the Delta Add-Ons to Machine 1, Regreen requested that G&H provide the same Delta package to Machine 0, so that it could also be sold with the significantly smaller footprint. These additions were reflected in a $112,500 invoice (PF102419). It has not been paid, either.

28)    By August 2019, Machine 1 was "Ready to Test," but Regreen was not prepared to make the payment. After lengthy negotiations, Regreen provided three post-dated checks totaling $494,000, all of which cleared without incident. (These

KINSELLA WEITZMAN ISER KUMP LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

payments, plus the ones in sections B and C and a final $194,000 payment in February 2020, satisfied Regreen's obligation to have paid 90% when the unit was "ready to test." (Ex. D p. 1.)) The testing itself did not go well—G&H had to open up Machine 0 to see what was different between the two machines—but after removing a baffle plate that Regreen had added to the Machine 1 design, Machine 1 passed. Accordingly, G&H shipped Machine 1 in six truckloads on October 23-29, 2019, at a cost of $39,500. Despite the "pre-paid and add" provision in the Letter Agreement, Regreen has not paid these costs. Nor has it paid the $48,965 in testing costs that preceded shipment.

**E.     G&H Declines to Convert Its Debt to Equity, and Regreen Refuses to Repay Any of Its Outstanding Debts**

29)     Once Machine 1 had shipped, G&H returned to the subject of the outstanding $1.6 million payment for Machine 0. Regreen assured G&H that a Los Angeles buyer would install it, and Regreen's cash crunch would be solved. At the same time, Regreen offered to convert the Note to preferred shares. But G&H—uncomfortable with Regreen's proffered valuations, as well as its inability (or unwillingness) to provide financial statements—declined the invitation. The Note, which matured on December 10, 2019 (Ex. C ¶ 5), remains outstanding.

30)     Unfortunately for Regreen, the Machine 1 buyer ran into permitting issues, which it now appears are insoluble. Then the pandemic struck. In late June 2020, Regreen refused to repay the Note, or any other outstanding amounts, citing numerous excuses and maintaining, despite all evidence to the contrary, that installation of Machine 1 would occur within six months.

31)     On July 10, 2020, G&H sent a demand letter seeking all outstanding sums owed by Regreen. In a panic, Regreen attempted, clumsily, to invoke "force majeure," and urged G&H to retract the letter, lest it harm Regreen's investor base. G&H declined to retract the letter. Regreen then claimed it had no way to make any payment.

32)    In November 2020, G&H informed Regreen that it was out of time, and G&H was not going to wait any longer for Regreen to find a home for Machine 0. G&H therefore spent the first two weeks of December 2020 preparing Machine 0 for shipment and sourcing a storage place to ship it. G&H warned Regreen that any associated expenses would be Regreen's responsibility, and given the scale of the equipment, they would not be cheap. As of the date of this Action, the process is ongoing.

## FIRST CAUSE OF ACTION

### Breach of Contract

### (Against All Defendants)

33)    Plaintiff incorporates by reference the allegations in paragraphs 1 through 32) of this Complaint, inclusive.

34)    Plaintiff has performed all conditions, covenants, and promises required on its part with respect to the terms and conditions of the Note, the Manufacturing Agreement, the Personal Guaranty, the January 2019 oral agreement, and the Letter Agreement, as alleged herein, except as excused, waived, or made impossible by the Defendants.

35)    Regreen has materially breached the Note, the Manufacturing Agreement, the January 2019 oral agreement, and the Letter Agreement, and Mardikian has materially breached the Personal Guaranty as alleged above.

36)    In particular, Regreen has breached its obligation to repay G&H the principal amount on the Note of $1.6 million. (Ex. C p. 1.) It has also breached its obligation to repay "interest from the date of" the Note (i.e., May 15, 2018) "on the unpaid principal balance at a rate equal to 6% per annum, computed on the basis of the actual number of days elapsed and a year of 365 days." (*Id.*) As of the Maturity Date of December 10, 2019 (*id.* ¶ 5), Regreen had accrued interest of $150,180. Since that date, interest has continued to accrue on the unpaid principal at the interest rate specified in the Note. *See* Cal. Civ. Code § 3289(a).

KINSELLA WEITZMAN ISER KUMP LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

37)    Mardikian has breached his obligation under the Personal Guaranty to repay to G&H the amounts that Regreen has "fail[ed] to … pay" under the Manufacturing Agreement (Ex. B ¶ 1)—which is to say, the Machine 0 purchase price of $1.6 million. (Ex. A ¶ 9(i).) Mardikian is also liable for statutory interest running from January 14, 2020 (i.e., 30 days after Machine 0 was ready for delivery) at 10 percent per annum. *See* Cal. Civ. Code § 3289(b).

38)    Regreen has breached its obligation under the January 2019 oral agreement to pay $112,500 for the "Delta Add-Ons" to Machine 1 and an additional $112,5000 for the corresponding modifications to Machine 0.

39)    Finally, Regreen has breached its obligation under the Letter Agreement to pay for $39,500 in "rigging/transportation efforts to clients or off-site locations"—i.e., locations other than on G&H's "own property" (Ex. D p. 1)—as reflected in Shipping Quote 36725.

40)    As a direct and proximate result of the Defendants' breaches, Plaintiff has suffered, and will continue to suffer, monetary damages in an amount to be proven at trial, but no less than $2,014,680.

## SECOND CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

### (Against Regreen)

41)    Plaintiff incorporates by reference the allegations in paragraphs 1 through 40) of this Complaint, inclusive.

42)    Implied in every contract, including the Manufacturing Agreement alleged herein, is a covenant among the parties thereto that no party will do anything to interfere with another party's enjoyment of its contractual rights and benefits, and that each contracting party will do everything that the contract presupposes it will do to accomplish the contract's purpose.

43)    To the extent that the Manufacturing Agreement vests discretion in Regreen as to the selection of the "customer" to whom Machine 0 is "delivered"

KINSELLA WEITZMAN ISER KUMP LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

(*see* Ex. A ¶ 9), Regreen has breached the covenant of good faith and fair dealing implied in the Manufacturing Agreement by exercising this discretion in bad faith, thereby frustrating Plaintiff's right to receive the benefits of the Manufacturing Agreement (and, by extension, the Personal Guaranty). Specifically, if the Court finds that the Phase 1 Payment is not due until 30 days after "the Rebuilt Machine" has "be[en] delivered to Regreen's customer" (*ibid.*),[6] Regreen has engaged in bad faith conduct by refusing, *inter alia*, (i) to sell it for a commercially reasonable price or (ii) to provide shipping or delivery instructions to G&H.

44)    As a direct and proximate result of the breaches by Regreen of the implied contractual obligations set forth in the Manufacturing Agreement alleged herein, Plaintiff has suffered monetary damages in an amount to be proven at trial, but no less than $1,748,164.

## THIRD CAUSE OF ACTION

### Common Counts

### (Against Regreen)

45)    Plaintiff incorporates by reference the allegations in paragraphs 1 through 44) of this Complaint, inclusive.

46)    In connection with Machines 1, 2 and 3, Regreen requested services from G&H, and Regreen agreed to pay G&H for these services. G&H provided the requested services to Defendants and acquired certain goods for use in those machines, and is entitled to recover from Regreen for the reasonable value of the

---

[6] For clarity, Plaintiff does not accept this construction but rather, pleads its implied covenant claim in the alternative. *See, e.g.*, *Celador Int'l Ltd. v. Walt Disney Co.*, 347 F. Supp. 2d 846, 853 (C.D. Cal. 2004) ("Even if Plaintiffs are not ultimately successful on their breach of contract claim, they may still be able to prevail on their breach of the covenant of good faith and fair dealing claim. Even if the fact finder concludes that the consensual terms of the contract did not impose such obligations on Defendants, the fact finder could conclude that the actions of Defendants frustrated a benefit of the contract ….").

1  services that G&H performed and the goods that G&H acquired for the benefit of

2  Regreen.

3      47)    In quantum meruit, in that Regreen obtained a benefit from G&H's

4  work on Machines 1, 2 and 3, which Regreen knew or should have known that G&H

5  was not performing gratuitously, but rather, at the express or implied request of

6  Regreen.

7      48)    In quantum valebant, on an open, mutual and current account, in that

8  Regreen obtained a benefit from G&H's procurement of certain parts and

9  components for use in Machines 1, 2 and 3, which Regreen knew or should have

10  known that G&H was not acquiring gratuitously, but rather, at the express or

11  implied request of Regreen.

12      49)    G&H is entitled to receive from Regreen the fair and reasonable value

13  of G&H's work and as shown on an open, mutual and current account between

14  G&H and Regreen, in an amount to be proven at trial but no less than $302,778.

15  This represents the sum total of $215,534 (i.e., the value of the work-in-process

16  materials specified by Regreen and faithfully procured by G&H to fulfill PO#01014

17  and PO#01015 in connection with Machines 2 and 3, respectively), and $87,244

18  (i.e., $13,090 in "emergency" shipping requested by Regreen (Invoice 107901),

19  $48,965 in testing costs (Invoice 36364), and $25,188 in parts costs (Invoice

20  116454) incurred in connection with Machine 1).

21                    **PRAYER FOR RELIEF**

22      WHEREFORE, Plaintiff prays for judgment against the Defendants, and each

23  of them, as follows:

24      1.    For the First Cause of Action, for actual, general, and compensatory

25  damages in an amount to be proven at trial, but no less than $2,014,680;

26      2.    For the Second Cause of Action, for actual, general, and compensatory

27  damages in an amount to be proven at trial, but no less than $1,748,164;

28

KINSELLA WEITZMAN ISER KUMP LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

3.      For the Third Cause of Action, for an award of the reasonable and fair value of G&H's work on Machines 2 and 3 in an account to be proven at trial, but no less than $302,778;

4.      For all pre-judgment interest at the maximum legal rate;

5.      For its costs of suit as allowable by law; and

6.      For such further relief as the Court may deem just and proper.

DATED:  January 12, 2021          KINSELLA WEITZMAN ISER KUMP LLP


By:      /s/ Alan Kossoff
        _____
        Alan Kossoff
        Attorneys for Plaintiff G&H
        DIVERSIFIED MANUFACTURING, LP

KINSELLA WEITZMAN ISER KUMP LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands trial by jury on all issues and causes of action triable by jury.

DATED:  January 12, 2021          KINSELLA WEITZMAN ISER KUMP LLP


By:    _/s/ Alan Kossoff_
       Alan Kossoff
       Attorneys for Plaintiff G&H
       DIVERSIFIED MANUFACTURING, LP

30654-00002/719663

COMPLAINT

# EXHIBIT A

## MANUFACTURING AGREEMENT FOR PHASE 1 AND 2

THIS MANUFACTURING AGREEMENT FOR PHASE 1 AND 2 (this "Agreement") is entered on May 15, 2018 (the "Effective Date") by and between G&H Diversified Mfg, L.P. (hereinafter referred to as "G&H") and Regreen Technologies, Inc. (hereinafter referred to as "Regreen"). G&H and Regreen each is referred to herein as a "Party" and both collectively are referred to herein as the "Parties".

WHEREAS, Regreen has designed, prototyped, and markets and sells innovative, patented technologically advanced waste processing and conversion systems under the "Regreen Systems" name, and these systems ("Regreen Systems") have been licensed by Regreen to a manufacturing company located offshore to manufacture Regreen Systems exclusively for Regreen.

WHEREAS, G&H is a manufacturing company with diverse expertise and automated capability sufficient to manufacture certain difficult products and systems.

WHEREAS, Regreen is interested in having a US manufacturing company manufacture under license Regreen Systems exclusively for Regreen, and Regreen is interested in collaborating with G&H for G&H to be a US manufacturer of Regreen Systems exclusively for Regreen to be used in US and abroad.

WHEREAS, G&H will purchase a Regreen System (the "Machine") as described in Section 1 below and disassemble and rebuild the Machine and create a master 3-D model, along with drawings, plans, and specifications for the rebuilt Machine.

WHEREAS, the Parties want to enter into a contract under which G&H will manufacture redesigned waste recycling machines and associated parts exclusively for Regreen, and G&H and Regreen contemplate a multi-stage business relationship and desire to enter into this Agreement to document that relationship.

NOW, THEREFORE, for and in consideration of the mutual covenants contained in this Agreement and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.  G&H will purchase one (1) 15-ton Regreen System from Regreen. This 15-ton Regreen System consists of three (3) components: a 15-ton dryer (the "Dryer"), a 15-ton cooker (the "Cooker"), and a 15-ton press (the "Press"), and all parts necessary for operation of the 15-ton Regreen System (the "Parts") (collectively, the Dryer, the Cooker, the Press and the Parts are referred to herein as the "Machine").

2.  The Machine is presently located at various manufacturers offshore. Regreen is responsible for having the Machine crated and transported from the present locations to G&H's facility located at 11919 Tanner Rd, Building B., Houston, TX 77041. Regreen will be designated as the importer of record of the Machine and will bear all costs, including, but not limited to taxes, duties, fees, and insurance, associated with crating and transporting the Machine from the various manufacturing sites located offshore to G&H. The Parties estimate transport time will be from thirty (30) to sixty (60) days. Although not required by this Agreement to do so, G&H anticipates it may hire additional personnel whose job focus will primarily be G&H's performance of this Agreement. So that any such hiring is timely, Regreen will regularly apprise G&H of the anticipated date of arrival of the Machine.

3.  Regreen will be onsite when the Machine is delivered to G&H's facility, will be present when the Machine is uncrated, will witness the uncrating of the Machine and final placement of the Machine, and will inspect the Machine for the purpose of identifying any damage to Machine and determining whether the Machine is in

good working order.  At the time of such inspection, Regreen must verbally report any damage to the Machine to G&H and thereafter prepare a written report detailing such damage, which will be provided to G&H within seven (7) days of the inspection.  Likewise, if during the inspection Regreen determines that the Machine or any component of the Machine is not in good working order, Regreen must verbally report such determination to G&H and thereafter prepare a written report detailing such determination, which will be provided to G&H within seven (7) days of the inspection.  Notwithstanding the foregoing, G&H may unilaterally or in conjunction with Regreen inspect the Machine for identifying any damage to Machine and determining whether the Machine is in good working order.  Any damage to the Machine or any non-working Parts will be the responsibility of Regreen.  G&H will work to fix the damage and replace non-working Parts at an additional cost.

4.  Before the Machine is crated and shipped, Regreen will cause photographs to be taken which depict all views and aspects of the Dryer, the Cooker, and the Press.  Regreen will provide the photographs to G&H as soon as they are available.

5.  G&H will dismantle the Machine, inspect and make measurements, and prepare a master 3-D model of the Machine in SolidWorks, together with material tables, and rebuild the Machine and stage it for pick-up by Regreen (collectively, these actions are referred to as "Phase 1").  In the process of dismantling the Machine, it is possible the Machine could be damaged.  Unless the damage is intended by G&H or is the result of negligence on G&H's part, G&H will neither be liable for such damage to the Machine, nor required to compensate Regreen for any economic damages it suffers as a result of the Machine being damaged. The Parties estimate dismantling the Machine, taking all required measurements and preparing a master 3-D model of the Machine in SolidWorks, together with material tables (the "Initial Tasks"), will be completed within four (4) months of the date the Machine is delivered to G&H's facility located at 11919 Tanner Rd, Building B., Houston, TX 77041.  Regreen acknowledges and agrees this is an estimate only because G&H does not have sufficient information to provide or agree to a firm date for completing the Initial Tasks, and G&H will not be responsible for any damages or other harm Regreen may suffer if completing the Initial Tasks reasonably requires more than four (4) months.  To assist G&H with completing the Initial Tasks within the estimated four (4) months, Regreen will provide G&H with any available design drawings, instructions, and specifications before the Machine arrives at G&H, will provide onsite engineering and design review as is reasonably necessary, including having Andrew Nguyen and Albert Mardikian, travel to Houston, Texas for this purpose, and will provide any other assistance or support as G&H reasonably requires.  Any costs Regreen incurs providing such onsite engineering and design review, including but not limited to travel, lodging, and meals, will be Regreen's responsibility to pay.

6.   Within a reasonable period of time after G&H completes the Initial Tasks, not to exceed thirty (30) days, G&H will begin rebuilding the Machine.  The Parties estimate rebuilding the Machine will require two (2) months. Regreen acknowledges and agrees this is an estimate only because the G&H does not have sufficient information to provide or agree to a firm date for completing the rebuild of the Machine, and G&H will not be responsible for any damages or other harm Regreen may suffer if rebuilding the Machine reasonably requires more than two (2) months.  The estimated rebuild time is also based on the assumption fasteners and components will go back together after disassembly.  G&H cannot predict the quality standards used in the country of origin when building the Machine.

7.  Upon completing the rebuild of the Machine, G&H will stage the rebuilt Machine (the "Rebuilt Machine") for pick-up and delivery to Regreen's customer.  The Rebuilt Machine must be picked up from G&H's facility within fourteen (14) days of G&H notifying Regreen the Rebuilt Machine is ready for pick-up.  Prior to the Rebuilt Machine being picked up from G&H's facility, Regreen, at its expense, will inspect and test the Rebuilt Machine.  Regreen will not designate the Rebuilt Machine as being ready for pick-up and will not allow the Rebuilt Machine to be picked up unless it is fully satisfied that the Rebuilt Machine is undamaged and in good working order.  Regreen will be responsible for all costs associated with inspecting and testing the Rebuilt

Machine and shipping the Rebuilt Machine to its customer. Once the Rebuilt Machine leaves G&H's facility, G&H has no responsibility for any damage to the Rebuilt Machine, regardless of when the damage occurred or what caused the damage, unless G&H purposefully caused the damage or the damaged resulted from G&H's negligence and has no responsibility if the Rebuilt Machine fails to work properly after being delivered to Regreen's customer.

8.   The purchase price for the Machine is One Million Six Hundred Thousand Dollars ($1,600,000). Prior to the Parties executing this Agreement, G&H wired Five Hundred Thousand Dollars ($500,000) to Regreen on April 17, 2018, leaving a balance of One Million One Hundred Thousand Dollars ($1,100,000) to be paid to Regreen. The balance of One Million One Hundred Thousand Dollars ($1,100,000) is not due and payable until (i) Regreen issues a purchase order for disassembly and reassembly of the Machine and creation of master SolidWorks drawings of the Machine, (ii) the Parties have fully executed a manufacturing agreement addressing Phase 1 and Phase 2 (as hereinafter defined), , and (iii) the Machine has arrived at the designated port of entry and has been cleared by the U.S. Customs and Border Protection. Regreen will not ship the Machine from the designated port of entry to G&H's facility until Regreen receives bank confirmation of G&H's wire transfer of the One Million One Hundred Thousand Dollars ($1,100,000). G&H believes it is buying a fully functioning Machine with no damage.

9.   Within thirty (30) days of the Rebuilt Machine being delivered to Regreen's customer, Regreen will pay G&H the agreed Purchase Price (as herein defined) equaling the sum of (i) One Million Six Hundred Thousand Dollars ($1,600,000), (ii) all costs G&H incurs in the process of disassembly, and reassembly of the Machine and creating the master 3-D model with plans and specifications for the Rebuilt Machine, and (iii) a profit margin of fifteen percent (15%) on the total costs incurred including the cost of the machine. The amount to be paid to G&H pursuant to this paragraph 9 is hereinafter referred to as the "Phase 1 Payment". To secure Regreen's payment of the Phase 1 Payment, Albert Mardikian, the founder, owner and Chief Executive Officer of Regreen, has personally guaranteed payment of the Phase 1 Payment. A true copy of Mr. Mardikian's Limited Personal Guaranty, dated May 14, 2018, accompanies this Agreement as Exhibit A. The original of Mr. Mardikian's Limited Personal Guaranty has been delivered to G&H.

10.  Regreen offers the opportunity of converting the whole or partial amount of the Phase 1 Payment to Regreen's current Convertible Note attached to this Agreement as Exhibit B. G&H can convert the whole or partial amount of the Phase 1 Payment into this Convertible Note during the term beginning the Effective Date of this Agreement and ending the earlier of the last day of the availability of the Convertible Note or  Regreen enters into negotiations with a major investor for Preferred A private equity investment.

11.  Upon G&H's completion of Phase 1, G&H will have the right, but not the obligation, to manufacture on an exclusive basis the first five (5) Redesigned Machines (as hereinafter defined) to be ordered by Regreen. The combination of a 15-ton dryer, 15-ton cooker, and 15-ton press, each based on the 3-D model and material tables G&H created for Regreen as part of Phase 1 is hereinafter referred to as a "Redesigned Machine". Regreen is not required to order all five (5) Redesigned Machines from G&H at the same time, but will issue purchase orders to G&H for the Redesigned Machines as needed. Until Regreen has ordered the five (5) Redesigned Machines from G&H, Regreen will not order a Redesigned Machine from a manufacture other than G&H without first obtaining G&H's written consent to do so.

12.  The purchase price for these first five (5) Redesigned Machines will be negotiated after completion of Phase 1, in good faith by the Parties and the Parties will take into consideration volumes order at a time, industry pricing and profit margins for manufacturing machines and equipment, which although different from the Redesigned Machines, are analogous in terms of complexity, materials, and length of manufacturing time and commitment.

13.  Payment terms for these first five (5) Redesigned Machines will be fifty percent (50%) of the purchase price

contemporaneously with issuance of a purchase order. Of the remaining fifty percent (50%) of the purchase price, forty percent (40%) is to be paid within thirty (30) days of a Redesigned Machine being tested, inspected and approved by Regreen, or before the Redesigned Machine is released for shipment, whichever is sooner. The remaining ten percent (10%) is to be paid after the installation of the Redesigned Machine and successful test run.

14. Shipping terms for the first five (5) Redesigned Machines are Ex-works G&H.

15. G&H believes the Redesigned Machine has great potential to be a high selling product. G&H's interest in Regreen extends far beyond Phase 1 and 2. In order to secure G&H's position as Regreen's exclusive United States manufacturer, Regreen grants G&H the right of first refusal when it comes time to implementing long term manufacturing plans beyond the first five (5) Redesigned Machines. G&H understands it has to be competitive with the market, but it will be given first right to the work, exclusive of all other potential suppliers in the US, when it comes to Regreen awarding a long term supply contract for the Redesigned Machine. G&H and Regreen will work in good faith to set pricing and terms for a long term contract at the completion of Phase 2. G&H is seeking a 10-year commitment from Regreen for exclusive rights to build Regreen's Redesigned Machines in the United States.

16. G&H agrees to use ASME or equivalent standards when manufacturing and testing all machines manufactured by G&H for Regreen or on behalf of Regreen.

17. The Parties will negotiate in good faith to determine G&H provided product liability insurance and warranty policy.

18. This Agreement may be terminated:

    a.  By the mutual written consent of the parties;

    b.  By either party giving sixty (60) days written notice of termination of this Agreement in the event that the other party has materially breached this Agreement and has failed to cure the breach thirty (30) days after written notice; or

    c.  The date either G&H or Regreen enters into any proceeding, whether voluntary or otherwise, in liquidation, dissolution, bankruptcy, reorganization or arrangement for the appointment of a receiver or trustee to take possession of its assets or any other proceeding under any law for the relief of creditors, or makes an assignment for the benefit of creditors.

19. The relationship between G&H and Regreen is and will be that of vendor-vendee and nothing in this Agreement shall be construed to create a relationship of principal and agent, independent contractor, partnership, joint venture or any other relationship other than that of vendor-vendee, and neither party is granted the right or shall have the authority to create any obligation or responsibility on behalf of, or in the name of, the other or bind the other in any manner whatsoever, by written or oral statement or otherwise.

20. The performance of this Agreement may be discontinued or temporarily suspended by either party in the event that performance is prevented by a cause or causes beyond the Parties' control. Such causes will include, but are not limited to, acts of God, acts of war, riot, fire, explosion, flood or sabotage. Impossibility of performance by reason of any legislative, executive or judicial act of any governmental authority will also excuse performance of or delay in performance of this Agreement.

21. This Agreement represents the entire understanding and agreement between the Parties relating to the dismantling, reverse engineering, rebuilding, and manufacturing of the machines which are the subject of this Agreement and supersedes any and all prior agreements, whether written or oral, between the parties

regarding the same or a similar business relationship, save and except for the Non-Disclosure Agreement executed between Regreen and G&H on November 11, 2017. No course of performance, usage of trade, understandings, purchase order, or agreement purporting to modify, supplement or explain any provision of this Agreement shall be effective unless it is executed in writing and signed by both parties.

22. No waiver of any provision or condition of this Agreement shall be construed or deemed to be waiver of any other provision or condition unless so expressed in writing and signed by both parties involved.

23. Any notice, communication, or statement required or permitted to be given hereunder shall be in writing and deemed to have been sufficiently given when delivered in person or by certified mail, postage prepaid return receipt requested, to the parties' addresses on the last page hereof.

24. The validity, interpretation and performance of this Agreement shall be construed in accordance with the laws of the state of California, and each Party expressly submits to the jurisdiction of the competent courts located in Orange, County, California. Each Party expressly and irrevocably waives any objection to such venue, including without limitation, *forum non conveniens* or lack of personal jurisdiction, and the Parties hereby expressly waive any other jurisdiction that may correspond to them by virtue of their current or future domiciles or for any other reason.

25. If any provision of this Agreement is declared invalid or unenforceable, then such provision shall be deemed severable from and shall not affect the remainder of this Agreement. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules, and regulations. If any provision of this Agreement, or the application thereof to any person or circumstance, is for any reason or to any extent invalid or unenforceable, the remainder of this Agreement and the application of such provision to the other persons or circumstances shall not be affected thereby, but rather is to be enforced to the greatest extent permitted by law.

26. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one instrument.

27. This Agreement may be amended only by a written instrument signed by each party hereto. This Agreement is not assignable without the express written consent of both parties and any attempted assignment without such express written consent will be null and void and of no effect. However, in the event of the sale or transfer by Regreen of all or substantially all of its assets to a third party, whether by sale, merger, or change of control, Regreen would have the right to assign any or all rights and obligations contained herein and this Agreement to the third party with the consent of G&H and this Agreement shall be binding upon the acquiring third party and would remain in full force and effect.

**IN WITNESS WHEREOF,** the Parties have entered into this Agreement as of the Effective Date.

**[SIGNATURES APPEAR ON THE FOLLOWING PAGE]**

G&H DIVERSIFIED MFG., LP

BY: _____
        Jimmy Kash
        President

ADDRESS:     11660 Brittmoore Park Dr.
                   Houston, TX 77041

Date: _____5|15|18_____


REGREEN TECHNOLOGIES,  INC.

BY: _____
        Anthony Moroyan
        Chairman

ADDRESS:     17791 Mitchell North
                   Irvine, CA 92614

Date: _____5/15/19_____

## EXHIBIT A
## Personal Guarantee

EXHIBIT B
Convertible Note and Purchase Agreement

# EXHIBIT B

## LIMITED PERSONAL GUARANTY

In consideration of and to induce G&H Diversified Mfg., LP, a Texas limited partnership ("G&H"), to agree

to manufacture, under Regreen Technologies, Inc., a California corporation ("Regreen") license, Regreen Systems

exclusively for Regreen pursuant to Manufacturing Agreement for Phase 1 and 2" Dated May 15, 2018

("Manufacturing Agreement").. Regreen has agreed to pay G&H the amounts of money specified in the

Manufacturing Agreement, between G&H and Regreen, and has agreed to procure and deliver this Limited Personal

Guaranty (the "Guaranty") of the obligations of Regreen to be executed by the undersigned (the "Guarantor"), who

has a substantial economic interest in Regreen.

NOW, THEREFORE, in consideration of the agreements between G&H and Regreen, plus other valuable

consideration, the receipt and sufficiency of which is hereby acknowledged, the Guarantor, for himself and on behalf

of his heirs, distributees, executors, administrators, successors and assigns, agrees that:

1.   If Regreen fails to perform any obligation on the part of Regreen to be performed or to pay, when due, all
     sums due G&H according to the terms and conditions of the Manufacturing Agreement, the Guarantor will
     pay any such amount (the "Debt") to G&H, or perform any such obligation;

2.   The Guarantor agrees not to pledge, hypothecate, mortgage, sell, or otherwise transfer all or substantially
     all of his assets prior to Regreen making full payment of the Debt and fully performing all of its obligations
     owed to G&H as set forth in the Manufacturing Agreement;

3.   No delay on the part of G&H in exercising any of its options, powers or rights, or partial or single exercise
     thereof, shall constitute a waiver thereof. No waiver of any of its rights hereunder, and no modifications
     or amendment of this Guaranty, shall be deemed to be made by G&H unless the same shall be in writing
     and signed by G&H and each such waiver, if any shall apply only with respect to the specific instance
     involved, and shall in no way impair the rights of G&H or the obligations of the Guarantor to G&H in any
     other respect at any other time. The rights, remedies and benefits of G&H under this Guaranty are
     cumulative and not exclusive of any other rights, remedies or benefits which G&H may have;

4.   It will not be necessary for G&H, in order to enforce the Guarantor's obligations under this Guaranty, to
     first institute a lawsuit or other proceeding against Regreen or exhaust any or all of G&H's remedies against
     Regreen;

5.   The Guarantor agrees that this Guaranty shall remain in full force and effect and be binding upon Guarantor
     until the Debt is paid and performed in full;

6.   The Guarantor agrees the possession of this Guaranty by G&H, or its successors or assigns, shall be
     conclusive evidence of due execution and delivery hereof by the Guarantor;

7.   This supersedes any previous contract, agreement or understanding in writing or verbal related to this
     subject matter;

8.   The Guarantor agrees this Guaranty shall be binding upon the heirs, legal representatives, heirs, distributees, executors, administrators, successors and assigns and assigns of the Guarantor, and shall inure to the benefit of G&H and its successors and assigns;

9.    This Guaranty shall be construed in accordance with and governed by the laws of the State of California.
      Any lawsuit that arises out of or concerns this Guaranty shall be filed in a court of competent jurisdiction
      located in Irvine, Orange County, California. Each party to this Guaranty irrevocably waives any objection
      to such venue, including without limitation, *forum non conveniens* or improper venue;

10.   If any provision of this Guaranty, or the application thereof to any person or circumstance, is for any reason
      or to any extent, invalid or unenforceable, the remainder of this Guaranty and the application of such
      provision to the other persons or circumstances shall not be affected thereby, but rather is to be enforced
      to the greatest extent permitted by law; and

11.   This Guaranty may not be assigned or transferred without a written document, signed by the Guarantor,
      Regreen, and G&H, permitting such assignment or transfer.

Dated as of this _25_ day of May 2018.

**GUARANTOR:**

ALBERT AVEDIS MARDIKIAN, Guarantor



# EXHIBIT C

*WSGR DRAFT*

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*ACT*"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

## REGREEN TECHNOLOGIES, INC.

### CONVERTIBLE PROMISSORY NOTE

$ 1,600,000                                          *Date*_____

FOR VALUE RECEIVED, Regreen Technologies, Inc., a California corporation (the "*Company*") promises to pay to **G&H Diversified Manufacturing, LP**, or its registered assigns ("*Investor*"), in lawful money of the United States of America the principal sum of **One Million and six hundred-thousand Dollars ($1,600,000),** or such lesser amount as shall equal the outstanding principal amount hereof, together with interest from the date of this Convertible Promissory Note (this "*Note*") on the unpaid principal balance at a rate equal to 6% per annum, computed on the basis of the actual number of days elapsed and a year of 365 days. All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the earlier of (i) the Maturity Date (as defined in Section 5), or (ii) when, upon the occurrence and during the continuance of an Event of Default, such amounts are declared due and payable by Investor or made automatically due and payable, in each case, in accordance with the terms hereof. This Note is one of the "Notes" issued pursuant to the Purchase Agreement.

The following is a statement of the rights of Investor and the conditions to which this Note is subject, and to which Investor, by the acceptance of this Note, agrees:

1.     *Payments*.

        (a)     *Interest.* Accrued interest on this Note shall be payable at the Maturity Date.

        (b)     *Voluntary Prepayment*. Upon five business days prior written notice to Investor, the Company may prepay this Note in whole or in part, *provided* that (i) any prepayment of this Note may only be made in connection with the prepayment of all Notes on a *pro rata* basis, based on the respective aggregate outstanding principal amounts of each such Note and (ii) any such prepayment will be applied first to the payment of expenses due under this Note, second to interest accrued on this Note and third, if the amount of prepayment exceeds the amount of all such expenses and accrued interest, to the payment of principal of this Note.

2.     ***Events of Default***. The occurrence of any of the following shall constitute an "***Event of Default***" under this Note and the other Transaction Documents:

(a)     *Failure to Pay*. The Company shall fail to pay (i) when due any principal payment on the due date hereunder or (ii) any interest payment or other payment required under the terms of this Note or any other Transaction Document on the date due and such payment shall not have been made within five (5) business days of the Company's receipt of written notice to the Company of such failure to pay;

(b)     *Breaches of Covenants*. The Company shall fail to observe or perform any other covenant, obligation, condition or agreement contained in this Note or the other Transaction Documents (other than those specified in **Section 2(a)**) and such failure shall continue for ten (10) business days after the Company's receipt of written notice to the Company of such failure;

(c)     *Representations and Warranties*. Any representation, warranty, certificate, or other statement (financial or otherwise) made or furnished by or on behalf of the Company to Investor in writing in connection with this Note or any of the other Transaction Documents, or as an inducement to Investor to enter into this Note and the other Transaction Documents, shall be false, incorrect, incomplete or misleading in any material respect when made or furnished;

(d)     *Other Payment Obligations*. Defaults shall exist under any agreements of the Company with any third party or parties which consists of the failure to pay any indebtedness for borrowed money at maturity or which results in a right by such third party or parties, whether or not exercised, to accelerate the maturity of such indebtedness for borrowed money of the Company, in each case, in an aggregate amount in excess of twenty-five million dollars ($25,000,000);

(e)     *Voluntary Bankruptcy or Insolvency Proceedings*. The Company shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) admit in writing its inability to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vi) take any action for the purpose of effecting any of the foregoing;

(f)     *Involuntary Bankruptcy or Insolvency Proceedings*. Proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company, or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or any of its subsidiaries, if any, or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within 45 days of commencement;

(g)     *Change of Control*. A Change of Control shall occur; or

(h)     *Judgments*. A final judgment or order for the payment of money in excess of twenty-five million dollars ($25,000,000) (exclusive of amounts covered by insurance) shall be rendered against the Company and the same shall remain undischarged for a period of 30 days during which execution shall not be effectively stayed, or any judgment, writ, assessment, warrant of attachment, or execution or similar process shall be issued or levied against a substantial part of the property of the Company or any of its subsidiaries, if any and such judgment, writ, or similar process shall not be released, stayed, vacated or otherwise dismissed within 30 days after issue or levy.

3.     ***Rights of Investor upon Default***. Upon the occurrence of any Event of Default (other than an Event of Default described in **Section 2(e)** or **2(f)**) and at any time thereafter during the continuance of

such Event of Default, Investor may, with the written consent of Investors holding more than 50% of the aggregate outstanding principal amount of the Notes, by written notice to the Company, declare all outstanding Obligations payable by the Company hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, anything contained herein or in the other Transaction Documents to the contrary notwithstanding. Upon the occurrence of any Event of Default described in **Section 2(e)** or **2(f)**, immediately and without notice, all outstanding Obligations payable by the Company hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, anything contained herein or in the other Transaction Documents to the contrary notwithstanding. In addition to the foregoing remedies, upon the occurrence and during the continuance of any Event of Default, Investor may, with the written consent of Investors holding more than 50% of the aggregate outstanding principal amount of the Notes, exercise any other right, power or remedy granted to it by the Transaction Documents or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

4.    *Conversion*.

(a)    *Voluntary Conversion.* If a Qualified Financing occurs prior to payment in full of the principal amount of this Note, Investor has the right, at Investor's option, at any time on or following the Qualified Financing, to convert the outstanding principal amount of this Note and all accrued and unpaid interest on this Note into fully paid and nonassessable shares of the preferred stock issued in such Qualified Financing ("***Qualified Preferred Stock***") and common stock, if applicable, at the Voluntary Conversion Price. The total combined number of shares of Qualified Preferred Stock and common stock, if applicable, to be issued upon voluntary conversion pursuant to this **Section 4**Error! Reference source not found. shall equal (x) the outstanding principal amount of this Note and all accrued and unpaid interest on this Note, *divided by* (y) the Voluntary Conversion Price (the "***Total Voluntary Conversion Shares***"). The Total Voluntary Conversion Shares shall consist of (i) a number of preferred stock equal to (x) the outstanding principal amount of this Note and all accrued and unpaid interest on this Note, *divided by* (y) the price per share paid by the other purchasers of the preferred stock sold in the Qualified Financing (the "***Voluntary Conversion Preferred Shares***") and (ii) a number of common stock equal to (x) the Total Voluntary Conversion Shares *minus* (y) the Voluntary Conversion Preferred Shares.

(b)    *Conversion Procedure.*

(i)    <u>Voluntary Conversion</u>. Before Investor shall be entitled to convert this Note into shares Qualified Preferred Stock and common stock, if applicable, it shall surrender this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) and give written notice to the Company at its principal corporate office of the election to convert the same pursuant to **Section 4**(a), and shall state therein the amount of the unpaid principal amount of this Note to be converted, together with all accrued and unpaid interest. Upon such conversion of this Note, Investor hereby agrees to execute and deliver to the Company, and shall be bound upon such conversion by the obligations in, all transaction documents entered into by other purchasers of the Qualified Preferred Stock (as may be amended), including a purchase agreement, an investor rights agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions (including, without limitation, a 180-day lock-up agreement in connection with an Initial Public Offering). The Company shall, as soon as practicable thereafter, issue and deliver to such Investor a certificate or certificates (or a notice of issuance of uncertificated shares, if applicable) for the number of shares to which Investor shall be entitled upon such conversion, including a check payable to Investor for any cash amounts payable as described in **Section 4(b)(ii)**. Any conversion of this Note pursuant to **Section 4(a)** shall be deemed to have been made upon the satisfaction of all of the conditions set forth in

this **Section 4(b)(i)** and on and after such date the Persons entitled to receive the shares issuable upon such conversion shall be treated for all purposes as the record holder of such shares.

(ii)    <u>Fractional Shares; Interest; Effect of Conversion</u>. No fractional shares shall be issued upon conversion of this Note. In lieu of the Company issuing any fractional shares to the Investor upon the conversion of this Note, the Company shall pay to Investor an amount equal to the product obtained by multiplying the applicable conversion price by the fraction of a share not issued pursuant to the previous sentence. In addition, to the extent not converted into shares of capital stock, the Company shall pay to Investor any interest accrued on the amount converted and on the amount to be paid by the Company pursuant to the previous sentence. Upon conversion of this Note in full and the payment of the amounts specified in this paragraph, the Company shall be forever released from all its obligations and liabilities under this Note and this Note shall be deemed of no further force or effect, whether or not the original of this Note has been delivered to the Company for cancellation.

(c)    *Conversion Preferred Stock.* Should all of any series of preferred stock issuable upon conversion of this Note be, at any time prior to full payment of this Note, redeemed or converted into shares of Company's common stock in accordance with the Company's articles of incorporation, then, to the extent this Note is convertible into such preferred stock, this Note shall immediately become convertible into that number of shares of common stock equal to the number of shares of the common stock that would have been received if this Note had been converted in full and the preferred stock received thereupon had been simultaneously converted into common stock immediately prior to such event.

(d)    *Notices of Record Date.* In the event of:

(i)    Any taking by the Company of a record of the holders of any class of securities of the Company for the purpose of determining the holders thereof who are entitled to receive any dividend or other distribution or any right to subscribe for, purchase or otherwise acquire any shares of stock of any class or any other securities or property, or to receive any other right;

(ii)    Any capital reorganization of the Company, any reclassification or recapitalization of the capital stock of the Company or any transfer of all or substantially all of the assets of the Company to any other Person or any consolidation or merger involving the Company; or

(iii)    Any voluntary or involuntary dissolution, liquidation or winding-up of the Company,

the Company will mail to Investor at least ten (10) days prior to the earliest date specified therein, a notice specifying (A) the date on which any such record is to be taken for the purpose of such dividend, distribution or right and the amount and character of such dividend, distribution or right; or (B) the date on which any such reorganization, reclassification, recapitalization, transfer, consolidation, merger, dissolution, liquidation or winding-up is expected to become effective and the record date for determining stockholders entitled to vote thereon.

5.    ***Definitions.*** As used in this Note, the following capitalized terms have the following meanings:

"***Change of Control***" shall mean (i) any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or

indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Board of Directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"*Event of Default*" has the meaning given in **Section 2** hereof.

"*Initial Public Offering*" shall mean the closing of the Company's first firm commitment underwritten initial public offering of the Company's common stock pursuant to a registration statement filed under the Securities Act.

"*Investor*" shall mean the Person specified in the introductory paragraph of this Note or any Person who shall at the time be the registered holder of this Note.

"*Investors*" shall mean the investors that have purchased Notes.

"*Fully Diluted Capitalization*" shall mean, as of immediately prior to voluntary conversion of this Note, the sum of (i) the outstanding shares of common stock of the Company; (ii) the shares of common stock of the Company directly or indirectly issuable upon conversion or exchange of all outstanding securities directly or indirectly convertible into or exchangeable for common stock of the Company and the exercise of all outstanding options and warrants; and (iii) the shares of common stock of the Company reserved, but neither issued nor the subject of outstanding awards, under any equity incentive or similar plan of the Company; provided that Fully Diluted Capitalization shall not include (i) the Notes and the securities directly or indirectly issuable upon conversion or exchange of the Notes, (ii) other outstanding convertible promissory notes and any related warrants and the securities directly or indirectly issuable upon conversion or exchange of such other outstanding convertible promissory notes and the exercise of any such related warrants or (iii) in any voluntary conversion relating to a financing, any securities issued in the financing, any shares of common stock of the Company directly or indirectly issuable upon conversion, exchange or exercise of such securities and any increase in the number of shares reserved for issuance under the Company's equity incentive or similar plans or arrangements in connection with the financing.

"*Maturity Date*" shall mean at the option of the Investor, (i) December 10, 2019, or (ii) any date prior to December 10, 2019 on or following the completion of the Special Milestone.

"*Notes*" shall mean the convertible promissory notes issued pursuant to the Purchase Agreement.

"*Obligations*" shall mean and include all loans, advances, debts, liabilities and obligations, howsoever arising, owed by the Company to Investor of every kind and description, now existing or hereafter arising under or pursuant to the terms of this Note and the other Transaction Documents, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Company hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U. S. C. Section 101 *et seq.*), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding.

"**Person**" shall mean and include an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

"**Purchase Agreement**" shall mean the Note Purchase Agreement, dated as of _____, _____ (as amended, modified or supplemented), by and among the Company and the Investors (as defined in the Purchase Agreement) party thereto.

"**Qualified Financing**" is a transaction or series of transactions pursuant to which the Company issues and sells shares of its preferred stock for aggregate gross proceeds of at least $3,000,000 (excluding all proceeds from the incurrence of indebtedness that is converted into such preferred stock, or otherwise cancelled in consideration for the issuance of such preferred stock) with the principal purpose of raising capital.

"**Securities Act**" shall mean the Securities Act of 1933, as amended.

"**Special Milestone**" shall mean the completion to the mutual reasonable satisfaction of the Investor and Company of those certain tasks described in Schedule 1 to this Note.

"**Transaction Documents**" shall mean this Note, each of any other Notes and the Purchase Agreement.

"**Voluntary Conversion Price**" shall mean a price per share equal to the lesser of (i) the price per share paid by the other purchasers of the preferred stock sold in the Qualified Financing and (ii) five dollars ($5) per share for the preferred stock sold in the Qualified Financing.

6.    *Miscellaneous*.

(a)    *Successors and Assigns; Transfer of this Note or Securities Issuable on Conversion Hereof; No Transfers to Bad Actors; Notice of Bad Actor Status.*

(i)    Subject to the restrictions on transfer described in this **Section 6(a)**, the rights and obligations of the Company and Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

(ii)    With respect to any offer, sale or other disposition of this Note or securities into which such Note may be converted, Investor will give written notice to the Company prior thereto, describing briefly the manner thereof, together with a written opinion of Investor's counsel, or other evidence if reasonably satisfactory to the Company, to the effect that such offer, sale or other distribution may be effected without registration or qualification (under any federal or state law then in effect). Upon receiving such written notice and reasonably satisfactory opinion, if so requested, or other evidence, the Company, as promptly as practicable, shall notify Investor that Investor may sell or otherwise dispose of this Note or such securities, all in accordance with the terms of the notice delivered to the Company. If a determination has been made pursuant to this **Section 6(a)** that the opinion of counsel for Investor, or other evidence, is not reasonably satisfactory to the Company, the Company shall so notify Investor promptly after such determination has been made. Each Note thus transferred and each certificate, instrument or book entry representing the securities thus transferred shall bear a legend as to the applicable restrictions on transferability in order to ensure compliance with the Securities Act, unless in the opinion of counsel for the Company such legend is not required in order to ensure compliance with the Securities Act. The Company may issue stop transfer instructions to its transfer agent in connection with such restrictions.

(iii)     Subject to **Section 6(a)(ii)**, transfers of this Note shall be registered upon registration books maintained for such purpose by or on behalf of the Company as provided in the Purchase Agreement. Prior to presentation of this Note for registration of transfer, the Company shall treat the registered holder hereof as the owner and holder of this Note for the purpose of receiving all payments of principal and interest hereon and for all other purposes whatsoever, whether or not this Note shall be overdue and the Company shall not be affected by notice to the contrary.

(iv)     Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of Investor.

(v)     Investor agrees not to sell, assign, transfer, pledge or otherwise dispose of any securities of the Company, or any beneficial interest therein, to any person (other than the Company) unless and until the proposed transferee confirms to the reasonable satisfaction of the Company that neither the proposed transferee nor any of its directors, executive officers, other officers that may serve as a director or officer of any company in which it invests, general partners or managing members nor any person that would be deemed a beneficial owner of those securities (in accordance with Rule 506(d) of the Securities Act) is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii) under the Securities Act, except as set forth in Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Securities Act and disclosed, reasonably in advance of the transfer, in writing in reasonable detail to the Company. Investor will promptly notify the Company in writing if Investor or, to Investor's knowledge, any person specified in Rule 506(d)(1) under the Securities Act becomes subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii) under the Securities Act.

(b)     *Waiver and Amendment.* Any provision of this Note may be amended, waived or modified upon the written consent of the Company and Investors holding more than 50% of the aggregate outstanding principal amount of the Notes; *provided, however,* that no such amendment, waiver or consent shall: (i) reduce the principal amount of this Note without Investor's written consent, or (ii) reduce the rate of interest of this Note without Investor's written consent, or (iii) eliminate Investor's right to voluntary conversion pursuant to Section 4(a).

(c)     *Notices.* All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, sent by electronic mail (if to Investor) or otherwise delivered by hand, messenger or courier service addressed:

(i)     if to Investor, to Investor's address or electronic mail address as shown in the Company's records, as may be updated in accordance with the provisions hereof, or, until such holder so furnishes an address or electronic mail address to the Company, then to the address or electronic mail address of the last holder of this Note for which the Company has contact information in its records; or

(ii)     if to the Company, to the attention of the Chief Executive Officer or Chief Financial Officer of the Company at 17791 Mitchell North, Suite C, Irvine, CA 92614, or at such other current address as the Company shall have furnished to Investor, with a copy (which shall not constitute notice) to Michael Danaher, Wilson Sonsini Goodrich & Rosati, P.C., 650 Page Mill Road, Palo Alto, CA 94304-1050.

Each such notice or other communication shall for all purposes of this Note be treated as effective or having been given (i) if delivered by hand, messenger or courier service, when delivered (or if sent via a nationally-recognized overnight courier service, freight prepaid, specifying next-business-day delivery, one business day after deposit with the courier), or (ii) if sent via mail, at the earlier of its receipt or five days after the same has been deposited in a regularly-maintained receptacle for the deposit of the United

States mail, addressed and mailed as aforesaid, or (iii) if sent via electronic mail, upon confirmation of delivery when directed to the relevant electronic mail address, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day. In the event of any conflict between the Company's books and records and this Note or any notice delivered hereunder, the Company's books and records will control absent fraud or error.

      (d)    *Pari Passu Notes.* Investor acknowledges and agrees that the payment of all or any portion of the outstanding principal amount of this Note and all interest hereon shall be *pari passu* in right of payment and in all other respects to any other Notes. In the event Investor receives payments in excess of its *pro rata* share of the Company's payments to the holders of all of the Notes, then Investor shall hold in trust all such excess payments for the benefit of the holders of the other Notes and shall pay such amounts held in trust to such other holders upon demand by such holders.

      (e)    *Payment.* Unless converted into the Company's equity securities pursuant to the terms hereof, payment shall be made in lawful tender of the United States.

      (f)    *Usury.* In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

      (g)    *Waivers.* The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

      (h)    *Governing Law.* This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of California, without regard to the conflicts of law provisions of the State of California, or of any other state.

      (i)    *Jurisdiction and Venue.* Each of Investor and the Company irrevocably consents to the exclusive jurisdiction of, and venue in, the state courts in Santa Clara County in the State of California (or in the event of exclusive federal jurisdiction, the courts of the Northern District of California), in connection with any matter based upon or arising out of this Note or the matters contemplated herein, and agrees that process may be served upon them in any manner authorized by the laws of the State of California for such persons.

      (j)    *Counterparts.* This Note may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Note.

*(signature page follows)*

The Company has caused this Note to be issued as of the date first written above.

**REGREEN TECHNOLOGIES, INC.,**
a California corporation

By: _____

Name: _____

Title: _____

**INVESTOR:**

**G&H Diversified Manufacturing, LP**

_____
*(Print investor name)*

_____
*(Signature)*

_____John Kaiser_____
*(Print name of signatory, if signing for an entity)*

_____Chief financial officer_____
*(Print title of signatory, if signing for an entity)*

_____11660 Brittmoore Park Dr._____
*(Street address)*

_____Houston, Tx. 77041_____
*(City, state and zip)*

e-Mail: ___jkaiser@ghdiv.com_____

Mobile: _____

SCHEDULE 1

SPECIAL MILESTONE TASKS

The Special Milestone shall have been deemed to have been satisfied when each of the following tasks have been completed to the mutual reasonable satisfaction of the Company and Investor:

- Creation of specifications, schematics, drawings, and/or other materials necessary for the manufacture of the Company's [waste processing system] in SolidWorks or another platform or program mutually acceptable to the Company and Investor;
- Manufacture by the Investor of a complete market-ready version of the Company's [waste processing system] to the specifications and standards of the Company (the "Complete System"); and
- Shipment to and receipt of the Company of a Complete System.

# EXHIBIT D

## LETTER AGREEMENT

This Letter Agreement ("Letter Agreement") entered into on September 13, 2018 ("Effective Date") by and between Regreen Technologies, Inc. ("Regreen") and G&H Diversified Mfg., L.P. ("G&H"). Each is referred to herein as a "Party" and both collectively are referred to herein as the "Parties".

G&H has received the design specifications and samples of Regreen Systems' select subsystems (Cooker, Press, Dryer and related conveyors, etc., hereafter referred to as "Regreen Subsystems") as described in Exhibit A Attachment to this letter agreement. Regreen has licensed G&H pursuant to Manufacturing Agreement between the parties, dated May 15, 2018 . G&H will start manufacturing the licensed Regreen Systems pursuant to purchase orders and releases from Regreen.

Regreen shall release (5) P.O.'s to G&H by September 13, 2018. G&H will produce first (5) Regreen Subsystems for **$1,730,000 each**. Completion Ready to Test ("RTT") dates are as follows:

   #1 – December 31, 2018

   #2 – January 31, 2019

   #3 – February 28, 2019

   #4 – March 31, 2019

   #5 – April 30, 2019

Regreen is confident this schedule will be compressed and agrees to pay 50% down payments as soon as Regreen Systems are purchased (with Purchase Orders, "P.O.'s") and released to production. G&H will only begin building systems for which a 50% down payment has been received. Regreen anticipates first down payments to arrive in 3 weeks and will transfer down payment for first (2) Regreen Subsystems and at its own sole discretion to include a third Regreen Subsystem. The price per Regreen Subsystems shall be $1,730,000 each. If Regreen transfers down payment for a total of (5) Regreen Subsystems within (60) days of Approval of fab drawings (that includes the prior down payments of 2 or 3 Regreen Subsystems), the price per Regreen Subsystems for all (5) Regreen Subsystems shall be $1,699,000 each.

G&H's goal is to reduce the price of the (15-ton) Machine to nearer **$1.25 million** for units #6+. Extensive global sourcing efforts are being deployed to achieve this price point. Machines at this price will NOT be 100% US-made.

Regreen may engage G&H to build other subsystems of Regreen. The parties shall discuss the details at that time.

Payment Terms for all Regreen orders is 50% down with order, 40% down when ready to test (RTT), and 10% net 30 days after installation of machine. G&H agrees to store completed units on its own property. When the completed units are tested and ready to ship shall receive 90% payment. All rigging/transportation efforts to clients or off-site locations is to be pre-paid and add (ex-works G&H-Houston) or handled by Regreen.

*Equity Discussion: G&H is seeking to own 1,800,000 shares (2%) of the total 90 million shares.*

1. G&H paid $1.6 million cash down in the Convertible Note @ $5/share that will convert into **320,000 Preferred A Shares.  This Convertible Note shall be changed to a standard automatic conversion Convertible Note.**
2. G&H credits $400,000 toward work performed for Regreen in another Convertible Note @ $5/share that will convert into **80,000 Preferred A Shares;**
3. G&H credits $300,000 per each of first (5) machines - $1.5 million, in a third Convertible Note @ $5/share that will convert into **300,000 Preferred Shares.**
4. Jimmy Kash & John Kaiser join Regreen Advisory Board @ 200,000 shares/each = **400,000 Common Shares in the form of Stock option.**
5. G&H credits $2.1 million** on machines #6+ at $3/share = **700,000 Common Shares**

**Payment schedule of $2.1 million will be based on velocity of new orders, to be determined at time machines #6+ are booked and down payments delivered to G&H. Regreen forecasts demand for 17 machines in 2019. G&H agrees to credit 10% of sale price of each machine (#6+) it builds until $2.1 million credit is paid in full.

***G&H Infrastructure:*** With completion of this deal, G&H will pursue the space and utilities required to scale production.

G&H Diversified MFG., LP

By:

Name: Jimmy Kash

Position: President

Date:  9/13/18


Regreen Technologies, Inc.

By:

Name: Albert Mardikian

Position: CEO

Date:  9/26/18

9/17/2018

## *EXHIBIT A*

The BOM for each SUB-SYSTEM is included in the original Proposal binder and listed here:

**15-TON COOKER:** COOKER VESSEL, DOUBLE-WALLED, WITH END CAPS TO INCLUDE LIDS, FORWARD AND AFT BASES, DRIVE MOTOR ASSEMBLY, MANIFOLD FOR STEAM HEAT AND INJECTION TO INCLUDE VALVES, VALVES AND PIPING FOR CONDENSATE RETURN, PLATFORM WITH STAIR AND INTERNAL DRIVE SCREW - AS PROVIDED

- BELT CONVEYOR FROM COOKER TO PRESS, AS PROVIDED (WILL BE CHANGED & QUOTED TO SCREW CONVEYOR)
- EXTERIOR PAINTED AS PER SPECIFIED
- MANUALS INCLUDED IN PRICE

**15-TON PRESS:** PRESS BODY WITH LIDS AND INLET ENCLOSING THE SCREEN AND FRAME ASSEMBLY TO INCLUDE GEAR BOX, DRIVE ASSEMBLY, FORWARD AND AFT BASES AND TWO INTERNAL SCREWS – AS PROVIDED

- SCREW CONVEYOR FROM PRESS TO DRYER – AS PROVIDED. (CHANGE TO BE QUOTED)
- EXTERIOR PAINTED AS PER SPECIFIED
- MANUALS INCLUDED IN PRICE

**15-TON DRYER:** DRYER VESSEL WITH END CAPS TO INCLUDE LID, AFT BASE, MOTOR BASE WITH DRIVE ASSEMBLY, VALVES AND PIPING FOR CONDENSATE RETURN, PLATFORM WITH STAIR, AND INTERNAL ROTOR ASSEMBLY – AS PROVIDED. PRICING INCLUDES (6) FLAT PLATES OR DISCS TO REPLACE FIRST DRYER COILS.

- EXTERIOR PAINTED AND INSULATED AS PER SPECIFIED.
- MANUALS INCLUDED IN PRICE.

### *Extra Equipment additions needing to be quoted:*

1. LOADING CONVEYOR FOR COOKER (ADDITION TO BE QUOTED)
2. OUTPUT CONVEYOR FROM DRYER TO HAMMERMILL (ADDITION TO BE QUOTED)
3. OUTPUT CONVEYOR FROM HAMMERMILL (ADDITION TO BE QUOTED)
4. HAMMERMILL GRINDER 15TPH (ADDITION TO BE QUOTED)